# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BEAR STEARNS MORTGAGE FUNDING TRUST 2006-SL1, by U.S. Bank, N.A., as Trustee, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 7701-VCL |
| | ) | |
| EMC MORTGAGE LLC and JPMORGAN CHASE BANK, N.A., | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 6, 2014
Date Decided: January 12, 2015

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philippe Z. Selendy, Sanford I. Weisburst, Erica P. Taggart, Alexei Tsybine, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Plaintiff Bear Stearns Mortgage Funding Trust 2006-SL1, by U.S. Bank, N.A., as Trustee.*

Daniel B. Rath, Rebecca L. Butcher, LANDIS RATH & COBB LLP, Wilmington, Delaware; Robert A. Sacks, SULLIVAN & CROMWELL LLP, Los Angeles, California; Brent J. McIntosh, SULLIVAN & CROMWELL LLP, Washington, D.C.; Darrell S. Cafasso, SULLIVAN & CROMWELL LLP, New York, New York; Ryan J. McCauley, SULLIVAN & CROMWELL LLP, Palo Alto, California; *Attorneys for Defendants EMC Mortgage LLC and JPMorgan Chase Bank, N.A.*

**LASTER, Vice Chancellor.**

The defendants previously moved to dismiss the plaintiff's verified amended complaint (the "Complaint") on grounds of laches. The court granted the motion to dismiss in part, ruling that all but one of the counts in the Complaint were untimely under Delaware's three-year statute of limitations (the "Dismissal Ruling").

The plaintiff moved for reargument under Court of Chancery Rule 59(f). This decision grants the motion and holds that the plaintiff's claims are timely. The meritorious grounds for reargument are (i) the identification of a controlling Delaware Supreme Court decision that the parties had not discussed, (ii) the further explication of a key contractual provision, and (iii) the implications of an amendment to the Delaware Code that the parties had not identified as having become effective.

The granting of the motion for reargument requires that the court reach arguments for dismissal that were not previously addressed. The upshot is that the motion to dismiss is granted as to Counts IV and VIII of the Complaint. Otherwise, it is denied.

## I.    FACTUAL BACKGROUND

The facts are drawn from the Complaint and the documents it incorporated by reference. At this procedural stage, the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

### A.    The Trust

Defendant EMC Mortgage LLC ("EMC") is the successor to EMC Mortgage Corporation, a company which created and sold residential-mortgage-backed securities. As their name implies, securities of this type give investors the right to receive cash flows generated by a portfolio of loans secured by mortgages on residential real estate. At the

1

time of the securitization giving rise to this lawsuit, EMC was a wholly owned subsidiary of Bear Stearns Companies LLC ("Bear Stearns").

In the securitization giving rise to this case, EMC sold 8,447 loans (the "Mortgage Loans") to the plaintiff, Bear Stearns Mortgage Funding Trust 2006-SL1 (the "Trust"), a common law trust governed by the laws of New York. As a technical legal matter, EMC did not sell the Mortgage Loans directly to the Trust or create the Trust itself. Instead, EMC sold the Mortgage Loans to Bear Stearns Asset Backed Securities I LLC (the "Conduit"), another wholly owned subsidiary of Bear Stearns. The Conduit then created the Trust and designated the Mortgage Loans as the trust fund for the Trust. The sale of the Mortgage Loans from EMC to the Conduit was governed by a Mortgage Loan Purchase Agreement dated July 28, 2006 (the "Purchase Agreement" or "MLPA").

In return for the Mortgage Loans, the Trust created and issued to the Conduit certificates representing beneficial ownership interests in the cash flows generated by the Mortgage Loans (the "Certificates"). The issuance of the Certificates to the Conduit was governed by a Pooling and Servicing Agreement dated as of July 1, 2006 (the "Servicing Agreement" or "PSA"). Other parties to the Servicing Agreement included the Trustee and EMC, which acted initially as the servicer for the Mortgage Loans. In that capacity, EMC was responsible for collecting principal and interest payments on the Mortgage Loans and depositing them with the Trustee for distribution to investors who held Certificates. As servicer, EMC also was responsible for maintaining documentation relating to the Mortgage Loans and for modifying Mortgage Loans or foreclosing on mortgaged properties if the Mortgage Loans became delinquent. EMC received fees for

2

these services. Effective April 1, 2011, defendant JPMorgan Chase Bank, N.A. ("JPMorgan"), succeeded EMC as servicer.

After receiving the Certificates pursuant to the Servicing Agreement, the Conduit passed the Certificates along to Bear Stearns & Co. Inc. (the "Underwriter"), another wholly owned subsidiary of Bear Stearns. The Underwriter sold the Certificates to investors pursuant to a prospectus dated June 7, 2006, and a prospectus supplement dated July 27, 2006.

The securitization closed on July 28, 2006. With the securitization completed, the Conduit dropped out of the picture. Any role it might have under the Purchase Agreement or the Servicing Agreement was ceded to the trustee of the trust, a position initially filled by LaSalle Bank, N.A., and presently occupied by U.S. Bank, N.A. ("U.S. Bank" or the "Trustee").

## B.    Problems With The Mortgage Loans

As of July 1, 2006, the Mortgage Loans had an aggregate principal balance of $501,324,359.27. But the Mortgage Loans experienced high rates of defaults and delinquencies, and in the first year, the Trust suffered $35.6 million in losses. By the second year, the Trust's losses had reached $136.6 million. As of February 2014, the Trust had suffered some $295 million in losses, representing nearly 60% of the original principal loan balance. Based on the loans' performance, certain investors who held Certificates began to suspect that EMC might have sold a bad batch to the Trust.

Beginning in summer 2011, at the direction of certain investors in the Trust, the Trustee asked EMC for loan origination files, servicing records, and other loan

3

documentation for the Mortgage Loans. In making these requests, the Trustee relied on at least three different sections of the Servicing Agreement, each of which contemplated that the Trustee owned and would have access to the mortgage files and related loan documents for the Mortgage Loans. *See* PSA §§ 3.04, 3.15 & 11.09.

EMC and its successor as servicer, JPMorgan, were less than cooperative in providing the files and related documents. The Trustee initially requested documents relating to 4,800 of the 8,447 loans. By early 2012, JPMorgan had produced files for only 797 loans. JPMorgan produced additional loan documents after the Trustee initiated this action. The Trustee ultimately reviewed the files for 2,742 loans. The Trustee has continued to seek additional documents, such as servicing files and quality control reports from JPMorgan.

**C.      The Trustee Invokes The Remedial Framework Of The Purchase Agreement.**

Beginning in December 2011, the Trustee notified EMC that certain Mortgage Loans did not comply with representations and warranties that EMC had made in the Purchase Agreement about their quality and characteristics (collectively, the "Loan Representations"). The Loan Representations included the following:

> (a) the information set forth in the Mortgage Loan Schedule hereto[1] is true and correct in all material respects;

---

[1] The Mortgage Loan Schedule was a compilation of information about the Mortgage Loans. Exhibit 2 of the Purchase Agreement, entitled "Mortgage Loan Schedule Information," identified thirty-three items of information that the Mortgage Loan Schedule was required to provide for each Mortgage Loan. The Servicing Agreement defined the Mortgage Loan Schedule as "[t]he list of Mortgage Loans . . . transferred to the Trustee as part of the Trust fund and from time to time subject to this Agreement" and identified thirty-two items of information that the schedule was required to provide for each Mortgage Loan. PSA § 1.01.

4

\* \* \*

(d) there is no monetary default existing under any Mortgage or the related Mortgage Note and there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach or event of acceleration . . .;

\* \* \*

(f) no selection procedure reasonably believed by the Mortgage Loan Seller to be adverse to the interests of the Certificateholders was utilized in selecting the Mortgage Loans;

\* \* \*

(n) at the time of origination, each Mortgaged Property was the subject of an appraisal which conformed to the underwriting requirements of the originator of the Mortgage Loan . . .;

\* \* \*

(r) the information set forth in Schedule A of the Prospectus Supplement with respect to the Mortgage Loans is true and correct in all material respects;

\* \* \*

(t) each Mortgage Loan was originated in accordance with the underwriting guidelines of the related originator;

\* \* \*

(v) the related Mortgage File[2] contains each of the documents and instruments listed in Section 2.01 of the [Servicing Agreement] . . . .

---

[2] The Purchase Agreement defined the Mortgage File as "[t]he items referred to in Exhibit 1 pertaining to a particular Mortgage Loan and any additional documents required to be added to such documents pursuant to this Agreement." MLPA § 1. Exhibit 1 of the Purchase Agreement, entitled "Contents of Mortgage File," identified six items that the Mortgage File was required to contain. The Servicing Agreement defined the Mortgage File as "[t]he mortgage documents listed in Section 2.01 hereof pertaining to a particular Mortgage Loan." PSA § 1.01. Section 2.01 identified in substance the same six items as Exhibit 1 of the Purchase Agreement.

MLPA § 7. In the Servicing Agreement, EMC reiterated the accuracy of the Loan Representations. Section 2.03 of that agreement stated:

> With respect to each Mortgage Loan as of the Closing Date . . ., [EMC] hereby remakes and restates each of the representations and warranties set forth in Section 7 of the [Purchase Agreement] to the [Trust][3] and the Trustee to the same extent as if fully set forth herein.

PSA § 2.03(b)(vii).

After identifying the non-conforming loans, the Trustee asked EMC to comply with a remedial procedure in the Purchase Agreement (the "Repurchase Provision"). It generally required that in the event of a breach of a Loan Representation, EMC would (i) cure the breach, (ii) repurchase the non-conforming loan, or (iii) if the breach occurred within the first two years after the securitization closed, replace the non-conforming loan with a conforming loan. The language of the Repurchase Provision stated:

> Upon discovery or receipt of notice by [EMC] . . . or the Trustee of a breach of any [Loan Representation] which materially and adversely affects the value of the interests of the [Trust],[4] the Certificateholders or the Trustee in any of the Mortgage Loans. . ., the party discovering or receiving notice of such breach shall give prompt written notice to the others.

> In the case of any such breach of a representation or warranty set forth in this Section 7, within 90 days from the date of discovery by [EMC], or the

---

[3] The actual language of the provision referred to "the Depositor," which for purposes of the Purchase Agreement meant the Conduit. The Trust is the successor to the Conduit as the holder of the Mortgage Loans, so this decision has replaced the reference to the Depositor with a reference to the Trust.

[4] The actual language of the provision referred to "the Purchaser," which for purposes of the Servicing Agreement meant the Conduit. The Trust is the successor to the Conduit as the holder of the Mortgage Loans, so this decision has replaced the reference to the Purchaser with a reference to the Trust.

date [EMC] is notified by the party discovering or receiving notice of such breach (whichever occurs earlier), [EMC] will

(i)      cure such breach in all material respects,

(ii)     purchase the affected Mortgage Loan at the applicable Purchase Price or

(iii)    if within two years of the Closing Date, substitute a qualifying Replacement Mortgage Loan in exchange for such Mortgage Loan;

MLPA § 7 (footnote and formatting added). Here too the Servicing Agreement backed up the Purchase Agreement by reiterating that EMC had an obligation to repurchase non-conforming loans. *See* PSA § 2.03(c). The version of the Repurchase Provision in the Servicing Agreement also provided that EMC "shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach." PSA § 2.03(c) (the "Reimbursement Provision").

The Purchase Agreement made the procedure contemplated by the Repurchase Provision the sole and exclusive remedy for any breaches of Loan Representations. The relevant language stated:

> The obligations of [EMC] to cure, purchase or substitute a qualifying Replacement Mortgage Loan shall constitute the [Trust's],[5] the Trustee's and the Certificateholder's sole and exclusive remedy under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the Mortgage Loans, except for the obligation of the [EMC] to indemnify the Purchaser for such breach as set forth in and limited by Section 14 hereof.

MLPA § 7 (the "Exclusive Remedy Provision").

---

[5] The actual language referred to the Purchaser. *See* n.4, *supra.*

**D. EMC Repurchases Some Mortgage Loans But Not Others.**

In response to the Trustee's requests, EMC agreed to repurchase certain loans but declined to repurchase others. Notably, although the Trustee made its first requests nearly four-and-a-half years after the securitization closed, EMC did not argue that the Trustee's claims of breach came too late such that the statute of limitations had run. It can be inferred at this procedural stage that EMC did not contend that the Trustee's claims of breach were untimely because the Purchase Agreement addressed the time period when such claim would accrue. It stated:

> Any cause of action against [EMC] or relating to or arising out of a breach by [EMC] of any representations and warranties made in this Section 7 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by [EMC] or notice thereof by the party discovering such breach and (ii) failure by [EMC] to cure such breach, purchase such Mortgage Loan or substitute a qualifying Replacement Mortgage Loan pursuant to the terms hereof.

MLPA § 7 (the "Accrual Provision"). EMC represented that each of its contractual obligations in the Purchase Agreement, including the Repurchase Provision and Accrual Provision, "constitute[d] a valid and binding obligation of [EMC] against it in accordance with its terms (subject to applicable bankruptcy and insolvency laws and other similar laws affecting the enforcement of the rights of creditors generally) . . . ." *Id.* § 8(e) (the "Binding Obligation Representation").

EMC also did not argue that the Trustee had waived any claims of breach or otherwise engaged in conduct giving rise to a timeliness defense by conducting due diligence on the Mortgage Loans. It can be inferred at this procedural stage that EMC did not make such an argument because the Purchase Agreement addressed the

8

interrelationship between (i) the Loan Representations, the Repurchase Provision, and the Accrual Provision, and (ii) a three-phase examination of the Mortgage Loan Files that the Purchase Agreement called on the Conduit or a party acting as the agent of the Conduit, such as the Trustee, to conduct. The actual details of the review process were spelled out in the Purchase Agreement and included the following steps:

- First, on or before the Closing Date, the Trustee would have reviewed the Mortgage Files and delivered to EMC an Initial Certification in which the Trustee confirmed that it had received the Mortgage Loan Files and that a note for each Mortgage Loan was in the files.[6]

- Second, within 90 days after the Closing Date, the Trustee would deliver an Interim Certification to the effect that the relevant documents for each Mortgage Loan had been executed.[7]

- Third, within 180 days after the Closing Date, the Trustee would deliver a final certification to the effect that any documents for each Mortgage Loan that needed to be recorded had in fact been recorded.[8]

The Purchase Agreement made clear that the Loan Representations represented a contractual allocation of risk between EMC and the Trust without regard to the review

---

[6] MLPA § 5(b). In the language of the Servicing Agreement, the Initial Certification "confirm[ed] whether or not [the Trustee] has received the Mortgage File for each Mortgage Loan, but without review of such Mortgage File, except to the extent necessary to confirm whether such Mortgage File contains the original Mortgage Note or a lost note affidavit and indemnity in lieu thereof." PSA § 2.02(a).

[7] MLPA § 5(c). In the language of the Servicing Agreement, the Interim Certification addressed "whether all required documents have been executed and received and whether those documents relate . . . to the Mortgage Loans [conveyed to the Trust]." PSA § 2.02(a).

[8] MLPA § 5(d). In the language of the Servicing Agreement, the Final Certification addressed "whether each document required to be recorded has been returned from the recording office with evidence of recording." PSA § 2.02(b).

process or any other due diligence that the Trustee might have conducted. Section 5(a) of the Purchase Agreement stated that "[t]he fact that [the Trust] or its agent has conducted or has failed to conduct any partial or complete examination of the related Mortgage Files shall not affect [the Trust's][9] rights to demand cure, repurchase, substitution or other relief as provided in this Agreement." MLPA § 5(a). Section 7 of the Purchase Agreement similarly stated that "[i]t is understood and agreed that the representations set forth in this Section 7 will inure to the benefit of the [the Trust],[10] notwithstanding . . . the examination of any Mortgage File." MLPA § 7.

### E. This Litigation

After EMC declined to repurchase the bulk of the loans that the Trustee identified as non-conforming, the Trustee filed its original complaint on July 16, 2012. The original complaint alleged that the Trustee had identified breaches of the Loan Representations in 716 of the 797 loans that the Trustee had examined.

Although the original complaint arrived five years, eleven months, and eighteen days after the closing of the securitization on July 28, 2006, EMC and its fellow defendants did not assert a timeliness defense. Instead, they agreed on a stipulated procedure for exchanging information and conferring to narrow the number of loans in dispute in advance of the filing of an amended complaint. Over the next year and a half,

---

[9] The actual language referred to the Purchaser. *See* n.4, *supra.*

[10] The actual language referred to the Purchaser. *See* n.4, *supra.*

the parties exchanged information, the Trustee made repurchase demands, the defendants responded to them, and the parties otherwise conferred about the loans.

On March 4, 2014, the Trustee filed the operative Complaint. It contained detailed allegations about serious and systemic flaws in EMC's loan origination process and numerous examples of specific types of underwriting problems, including loan files where the borrower's purported employment status conflicted with more credible documentation, loan files where the borrower's purported income appeared grossly overstated given the nature of the borrower's employment, cases where documents in the loan file reflected that a purported owner-occupied property was misclassified and actually occupied by tenants, and loan files where the loans exceeded the maximum loan-to-property-value ratio. Based on the detailed allegations about these serious and systemic problems, the Complaint credibly asserted that EMC intentionally securitized non-conforming loans.

The Complaint framed ten substantive counts:

- Count I advanced a claim for breach of the Repurchase Provision.

- Count II advanced a claim for anticipatory breach of the Repurchase Provision on the theory that EMC will refuse to repurchase non-conforming Mortgage Loans in the future.

- Count III sought a declaratory judgment that EMC must repurchase non-conforming Mortgage Loans in accordance with the Repurchase Provision.

- Count IV asserted that EMC and JPMorgan discovered the breaches of the Loan Representations but failed to notify the Trustee as required by the Purchase Agreement and Servicing Agreement.

- Count V asserted that EMC has breached the Reimbursement Provision by failing to reimburse the Trustee for expenses reasonably incurred by the Trustee in enforcing its remedies under the Repurchase Provision.

11

- Count VI asserted that JPMorgan breached the sections of the Servicing Agreement governing the Mortgage Loan Files and other documents by failing to provide documents to the Trustee.

- Count VII sought an accounting from JPMorgan to identify the disposition of each of the Mortgage Loans, including any modifications, repurchases, or liquidations.

- Count VIII sought indemnification for the Trust's losses and expenses, including legal fees and costs.

- Count IX contended that EMC failed to pay the repurchase price required by the Repurchase Provision for the loans that it repurchased.

- Count X alleged that EMC was unjustly enriched when it made demands on third-party originators to repurchase non-conforming loans, settled with these originators, and kept the proceeds without passing them on to the Trust.

By the time the Trustee filed the Complaint, the Trustee had identified breaches of the Loan Representations relating to 2,583 of the 2,742 loans it had reviewed. Rather than refusing to consider the alleged defects on timeliness grounds, EMC cured the identified breaches for 60 of the loans and repurchased or provided a make-whole payment for another 133 loans.

## F. The Motion To Dismiss

On April 7, 2014, two years after the action originally was filed, EMC and its fellow defendants moved to dismiss the Complaint as untimely. In doing so, they appear to have been inspired by two intervening decisions from New York. In one, an intermediate state appellate court held that any breach of the representations about the underlying mortgage loans occurred at closing such that the statute of limitations began to run at that point. *See ACE Sec. Corp.* v. *DB Structured Prods., Inc.* 112 A.D.3d 522 (N.Y. App. Div. 2013). In the other, a federal court held that New York law would not permit an accrual provision to be used to lengthen the statute of limitations. *See Lehman*

*XS Trust, Series 2006-4N ex rel. U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 991 F. Supp. 2d 472 (S.D.N.Y. 2014).

If these decisions applied to the Trust, then the Trustee's claims accrued on July 28, 2006, when the securitization closed, and the time for filing suit could not have been extended by the Accrual Provision. If New York's six-year statute of limitations applied, then the Trustee's claims would be timely regardless, because the Trustee filed suit on July 16, 2012. But the applicable Delaware statute of limitations is three years, not six. 10 *Del. C.* § 8106(a). In their motion to dismiss, the defendants argued that, by statute, a Delaware court must apply the shorter of the two limitations periods. The statute states:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.

10 *Del. C.* § 8121 (the "Borrowing Statute"). If the Delaware statute applied and the limitations period was not otherwise tolled or extended, then the time for filing suit ran on July 28, 2009, making the Trustee's claims untimely.

## G.     The Ruling On The Motion To Dismiss

After a hearing on August 19, 2014, I issued the Dismissal Ruling. In assessing the question of timeliness, both sides agreed that the doctrine of laches provided the appropriate framework. But because equity follows the law, "a party's failure to file within the analogous period of limitations will be given great weight in deciding whether

the claims are barred by laches." *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 & n.17 (Del. 2009). The Dismissal Ruling therefore analyzed the timeliness of the Trustee's claims using the statute of limitations.

The Dismissal Ruling relied heavily on *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC*, 2012 WL 3201139 (Del. Ch. Aug. 7, 2012), which also involved claims for breaches of representations about loans underlying residential-mortgage-backed securities. First, the Dismissal Ruling followed *Central Mortgage* in holding that the Borrowing Statue required application of Delaware's shorter three-year limitations period. *See Cent. Mortg.*, 2012 WL 3201139, at *16. The parties did not raise, and the Dismissal Ruling failed to take into account, Delaware authorities that interpreted the Borrowing Statute differently, such as *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co., Inc.*, 866 A.2d 1 (Del. 2005).

Next, as to the time when the claims accrued, the ruling followed *Central Mortgage* in holding that, absent tolling, the statute of limitations for any claim for breach of the Loan Representations began to run at the time the securitization closed. *See* 2012 WL 3201139, at *17. The ruling noted that the agreement in *Central Mortgage* did not involve a true accrual provision, but treated a notice provision that appeared in the agreement at issue in *Central Mortgage* as substantially similar. *See id.* at *19. The Dismissal Ruling did not sufficiently take into account other Delaware authorities that have treated an accrual provision as a condition precedent that defers the point when a claim arises and the statute of limitations begins to run. These authorities include *Aircraft Service, International, Inc. v. TBI Overseas Holdings, Inc.*, 2014 WL 4101660 (Del.

14

Super. Aug. 5, 2014), a decision issued after the completion of briefing on the motion to dismiss but before the hearing date.

Third, as to the ability of the Accrual Provision to permit a party to bring a claim more than three years after closing, the Dismissal Ruling held that parties could not lengthen the applicable statute of limitations by contract. The Dismissal Ruling did not take into account Section 8106(c) of Title 10 of the Delaware Code, 10 *Del. C.* § 8106(c), which became effective on August 1, 2014, after the briefing but before the hearing date.

## II.    LEGAL ANALYSIS

Rule 59(f) provides that "[a] motion for reargument setting forth briefly and distinctly the grounds therefor may be served and filed within 5 days after the filing of the Court's opinion or the receipt of the Court's decision." Ch. Ct. R. 59(f). The moving party bears the burden of demonstrating that the court "overlooked a decision or principle of law that would have controlling effect" or "misapprehended the law or the facts so that the outcome of the decision would be affected." *Miles, Inc. v. Cookson Am., Inc.*, 677 A.2d 505, 506 (Del. Ch. 1995) (internal quotation marks omitted). Upon reflection, the Dismissal Ruling overlooked three pertinent lines of authority that would have affected the outcome of the decision.

### A.    The Borrowing Statute

The first basis for reconsideration is the Delaware Supreme Court decision in *Saudi Basic*, which appears to be a controlling precedent. As noted, the Dismissal Ruling followed *Central Mortgage* in holding that the Borrowing Statue required application of Delaware's three-year limitations period, rather than New York's six-year period. *See*

15

*Cent. Mortg.*, 2012 WL 3201139, at \*16. The *Saudi Basic* decision holds, however, that the Borrowing Statute only applies when a party seeks to take advantage of a longer Delaware statute of limitations to bring a claim that would be time-barred under the law of the jurisdiction governing the claim.[11]

In *Saudi Basic*, a Saudi Arabian corporation, Saudi Basic, sought a declaratory judgment against two of its joint venture partners in the Superior Court of Delaware. In response, one of the defendant joint venture partners interposed counterclaims for damages relating to the joint venture agreements. The counterclaims arose under Saudi law, which did not impose any time-bar on the claims. Saudi Basic argued that the Borrowing Statute applied to the counterclaims, so the defendant's claims were time-

---

[11] *Saudi Basic*, 866 A.2d at 17-18; *see Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at \*5 (Del. Super. Apr. 16, 2014) (declining to apply the Borrowing Statute because "Florida has longer limitations periods than Delaware, making the facts of this case the opposite of what the Borrowing Statute seeks to prevent."); *Calcaño Pallano v. AES Corp.*, 2011 WL 2803365, at \*3 (Del. Super. July 15, 2011) ("The [Borrowing Statute's] purpose is to prevent a non-resident from bringing a foreign cause of action, which is precluded by that jurisdiction's statute of limitations, in Delaware where the statute of limitations period is longer."); *Juran v. Bron*, 2000 WL 1521478, at \*12 (Del. Ch. Oct. 6, 2000) (declining to apply the Borrowing Statute under laches framework where claims governed by California law were timely under that state's longer statute of limitations); *accord In re Washington Mut., Inc.,* 2010 WL 3238903, at \*5 (Bankr. D. Del. Aug. 13, 2010) ("[T]he [B]orrowing [S]tatute is meant to prevent either party in a suit from circumventing the statute of limitations of another jurisdiction by choosing Delaware as the forum state" so the reasoning in *Saudi Basic* was not limited "to situations in which plaintiffs choose a forum in order to prevent time-barred counterclaims."); *In re Mervyn's Hldgs., LLC*, 426 B.R. 488, 503 (Bankr. D. Del. 2010) (holding that the Borrowing Statute was "inapplicable" where the plaintiff "came to Delaware with a shorter (instead of longer) statute of limitations period" such that there was "absolutely no threat of forum shopping"); *see also Dymond v. Nat'l Broad. Co.*, 559 F. Supp. 734, 735 (D. Del. 1983) ("Delaware has made the policy determination in conflict of law decisions that when a cause of action arises outside of Delaware, and that action would be barred in the state in which it arose because of that state's statute of limitations, the cause of action cannot be brought in Delaware."). *But see Huffington v. T.C. Gp., LLC*, 2012 WL 1415930, at \*9 (Del. Super. Apr. 18, 2012) (reading *Saudi Basic* narrowly).

16

barred under Delaware's three-year statute of limitations. 866 A.2d at 10-11. The trial court held that Delaware's three-year statute of limitations did not apply, notwithstanding the Borrowing Statute, because the claims were timely under Saudi law. *Id*. at 7.

After a jury awarded damages on the counterclaims, Saudi Basic appealed. The Delaware Supreme Court affirmed, noting that the statute was "designed to prevent shopping for the most favorable forum." *Id*. at 16. The Delaware Supreme Court observed that the Borrowing Statute typically serves this purpose by "prevent[ing] the plaintiff from circumventing the shorter limitations period mandated by the jurisdiction where the cause of action arose." *Id*. at 17. But where the Borrowing Statute would call for the application of a shorter statute of limitations to claims that otherwise would be timely, the Delaware Supreme Court held that applying the statute literally would "subvert the statute's fundamental purpose, by enabling [the plaintiff] to prevail on a limitations defense that would never have been available to it had the . . . claims been brought in the jurisdiction where the cause of action arose." *Id*. at 18-19 (footnote omitted).

Since *Saudi Basic*, Delaware courts have declined to apply the Borrowing Statute when its operation would bar a claim that would be timely under the law governing the claim. For example, in the *Furnari* case, a Florida plaintiff brought breach of contract claims in Delaware that arose in Florida. 2014 WL 1678419, at *4. The defendants asserted that the claims were time-barred in Delaware under the Borrowing Statute. The Delaware Superior Court held that the Borrowing Statute did not apply:

> Florida has longer limitations periods than Delaware, making the facts of this case the opposite of what the Borrowing Statute seeks to prevent; Plaintiff is not attempting to circumvent the expiration of his claims by filing in Delaware, he only seeks jurisdiction over the parties. A finding otherwise would "subvert that statute's underlying purpose."

*Id.* at *5 (quoting *Saudi Basic*). Other decisions have applied *Saudi Basic* similarly. *Washington Mut.*, 2010 WL 3238903, at *5 (holding that, under *Saudi Basic*, the Borrowing Statute would not require application of a shorter Delaware statute of limitations to foreclose a claim that would be timely if brought in the jurisdiction whose law governed the claim); *Mervyn's Hldgs.,* 426 B.R. at 503 (same).

The parties did not identify *Saudi Basic*, and the Dismissal Ruling relied instead on *Central Mortgage*. There, the plaintiff failed to contest the application of the Borrowing Statute and the shorter Delaware statute of limitations, choosing only to argue that its claims were not barred under common law doctrines. *See Cent. Mortg.* 2012 WL 3201139, at *17. Like the plaintiff in this case, the plaintiff in *Central Mortgage* did not cite *Saudi Basic*, and the *Central Mortgage* decision did not consider that decision.

Although the court believes that the holding in *Central Mortgage* better reflects the plain language of the Borrowing Statute, this court is bound to follow the Delaware Supreme Court's opinion in *Saudi Basic*. Under *Saudi Basic*, the Borrowing Statute does not apply if it would enable the party seeking dismissal "to prevail on a limitations defense that would never have been available to it had the . . . claims been brought in the jurisdiction where the cause of action arose." 866 A.2d at 17-18. That is the case here.

Under *Saudi Basic*, once a court has determined that "the [B]orrowing [S]tatute is inapplicable, Delaware's general choice-of-law rules determine which state's statute of

limitations applies . . . through application of the 'most significant relationship test set forth in the Restatement (Second) of Conflicts of Laws.'" *Washington Mut.*, 2010 WL 3238903, at *6; *see also Travelers Indem. Co. v. Lake*, 594 A.2d 38, 40 (Del. 1991) (holding that Delaware employs the "most significant relationship test"). Under that test, a court considers "the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship, if any, between the parties is centered." *Washington Mut.*, 2010 WL 3238903, at *6.

In this case, the "most significant relationship" test points to New York. The parties' only connection to Delaware is EMC's place of incorporation and the plaintiff's decision to file suit in Delaware. The parties have numerous connections to New York, including the Trust's status as a New York common law trust, the creation of the Trust in New York by EMC and other Bear Stearns affiliates, all of whom had their principal places of business in New York, the underwriting of the Certificates in New York, and the physical location of the Certificates at the Depository Trust Company located in New York. The Purchase Agreement and Servicing Agreement chose New York law to govern their terms.

Once New York's six-year limitations period applies, then the Trust's claims were timely. Assuming that the Trust's claims accrued on July 28, 2006, when the securitization closed, the six-year statute of limitations did not run until July 28, 2012. The Trust filed suit on July 16, 2012, within the limitations period.

**B.     The Accrual Provision**

Assuming the Borrowing Statute calls for the application of Delaware statute-of-limitations principles, a second set of authorities makes reconsideration appropriate. Under cases that the Dismissal Ruling did not sufficiently consider, Delaware law treats an accrual provision as a condition precedent to the running of the statute of limitations.

A long line of Delaware decisions follows hornbook law in treating a contractual accrual provision as a condition precedent to a plaintiff's ability to sue such that the statute of limitations does not begin to run until the condition precedent is met.[12] The most recent decision in this line of authority is *Aircraft Services*, a case in which the timeliness of the lawsuit by the buyer for indemnification from the seller for injuries resulting from alleged breaches of representations in the transaction agreement turned on the effect of the following provision:

---

[12] *See Allstate Ins. Co. v. Spinelli*, 443 A.2d 1286, 1287 (Del. 1982) ("[A] cause of action does not accrue, and hence the [statute of limitations] does not begin to run, until the insurer denies coverage and notifies its insured of rejection of any claim for such benefits" rather than at the time of the accident ultimately giving rise to the payment obligation.); *Wilhelm v. Nationwide Gen. Ins. Co.,* 2011 WL 4448061, at *3 (Del. Super. May 11, 2011) (same), *aff'd*, 29 A.3d 246 (Del. 2011); *Goodyear v. Fleece*, 1988 WL 130470, at *2 (Del. Super. Nov. 16, 1988) (same); *Millsboro Fire Co. v. Constr. Mgmt. Serv., Inc.*, 2009 WL 846614, at *7 (Del. Super. Mar. 31, 2009) (holding that when the parties agreed to a dispute resolution process, and that process had not ended, the party seeking relief "had no way of knowing whether [the other party] would pay its claims . . . . To find otherwise would require a [party] to file suit . . . whether or not the dispute resolution procedures under the contract were still ongoing."), *decision clarified on reargument*, 2009 WL 4017766 (Del. Super. Nov. 12, 2009); *see also Rawlings v. Ray*, 312 U.S. 96, 98 (1941) (holding that a cause of action accrued when a party failed to pay a claim on the required date, not the date when the payment obligation was created). *See generally* 51 Am. Jur. 2d, *Limitation of Actions* § 127; 1A C.J.S. *Actions* § 301; 17A C.J.S. *Contracts* § 450; RESTATEMENT (SECOND) OF CONTRACTS § 225 (1981); RESTATEMENT (FIRST) OF CONTRACTS § 250 (1932).

20

> [I]f written notice of a violation or breach of any specified representation, warranty, covenant or agreement is given to the party charged with such violation or breach during the period provided for in this Section 10.1(g), such representation, warranty, covenant or agreement shall continue to survive until such matter has been resolved by settlement, litigation (including all appeals related thereto) or otherwise.

2014 WL 4101660 at *4. The defendants argued that this provision "impermissibly extend[ed] the statute of limitations, contrary to Delaware law." *Id*. The Superior Court disagreed, holding that compliance with the notice requirement was a condition precedent to suit and that the statute of limitations did not begin to run until the condition was met. *Id*. at *4-5.

In this case, the Accrual Provision functioned as a condition precedent that postponed the point when a claim arose and the statute of limitations would begin to run. It stated that "[a]ny cause of action against [EMC] . . . shall accrue as to any Mortgage Loan upon [notice or discovery and failure to cure]." MLPA § 7. The defendants themselves appear to have understood the Accrual Provision to operate in this fashion, at least until the issuance of the *GreenPoint* decision gave them a contrary argument. As discussed earlier, the defendants previously engaged in over a year and a half of litigation on the merits before moving to dismiss the action as time-barred after *GreenPoint* suggested a different outcome. EMC and other securitization sponsors also argued affirmatively in various lawsuits that trustees did not have a right to sue to enforce the repurchase obligation unless and until the loan seller had the opportunity to cure the

21

identified breaches of representations and failed to do so.[13] In other words, they invoked provisions like the Accrual Provision as conditions precedent. Moreover, EMC and other securitization sponsors acknowledged in other proceedings that their repurchase obligations survived for the life of the trust and that the trustee could bring repurchase claims upon the seller's failure to repurchase, a position that only made sense if the provisions operated as conditions precedent.[14]

---

[13] *See* Mem. of Law in Support of Defendant's Mot. To Stay at 11, 15, *Bear Stearns Mortg. Funding Trust 2007-AR2 v. EMC Mortg. LLC,* C.A. No. 6861-VCL (Del. Ch. Jun. 2, 2014) ("[T]he parties should exhaust the contractual repurchase process in good faith before litigating issues that may never need to be litigated. . . . [T]he PSA requires [the Trustee] to provide 'notice' of breaches and affords EMC an opportunity to cure or repurchase breaching loans."); Reply Mem. of Law in Further Support of JPMorgan Chase Bank, N.A. and Washington Mutual Mortg. Secs. Corp.'s Mot. to Dismiss and Mot. for Partial Summary Judgment, at 12, *Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 09-1656 (RMC) (D.D.C. Feb. 11, 2011) (asserting that "the statute of limitations . . . begins to run when there is a breach of an access, notice or repurchase obligation."); Defendants' Mem. of Law in Support of Mot. to Dismiss, at 17, *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, Index No. 652388/2011 (N.Y. Sup. Ct. May 21, 2012) ("That such notice and opportunity to cure [breaches of representations and warranties] stand as a condition precedent to suit is spelled out clearly."); Mem. of Law in Support of Mot. to Dismiss, at 18, *Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Hldgs. LLC,* Index No. 652763/2012 (N.Y. Sup. Ct. Oct. 9, 2012) ("The parties' agreements do not permit an investor to evade this contractually prescribed [cure/repurchase] procedure and to seek repurchase in this litigation of loans as to which it never gave [Defendant] notice and an opportunity to cure); Mem. of Law in Support of Defendant's Mot. to Dismiss, at 21, *Citigroup Mortg. Loan Trust 2007-AMC3 v. Citigroup Global Mkts. Realty Corp.*, No. 13 Civ. 2843 (S.D.N.Y. July 17, 2013) (Citigroup arguing same); Mem. of Law in Support of Defendant's Mot. to Dismiss, at 14, *Home Equity Mortg. Trust Series 2006-1 v. DLJ Mortg. Capital Inc.*, Index No. 156016/2012 (N.Y. Sup. Ct. Mar. 29, 2013) (DLJ/Credit Suisse arguing same).

[14] Brief Of Amicus Curiae The Association Of Mortgage Investors In Support Of Plaintiff-Respondent at 17, *ACE Secs. Corp., Home Equity Loan Trust, Series 2006-SL2, by HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc*., No. 650980/2012 (S.D.N.Y. Nov. 12, 2013).

In connection with the Dismissal Ruling, the parties did not address *Aircraft Services*, and the Dismissal Ruling focused instead on *GreenPoint*, a case in which a New York federal court held parties could not use an accrual provision to extend the statute of limitations under New York law. *See* 991 F. Supp. 2d at 478. The Dismissal Ruling mistakenly interpreted *Central Mortgage* as suggesting the same result under Delaware law. But the agreement in *Central Mortgage* did not contain an actual accrual provision. It contained a notice-and-repurchase provision that provided as follows:

> Within 60 days of the earlier of either discovery by or notice to the Seller of any such breach of a representation or warranty which materially and adversely affects the ownership interest of the Servicer in the [s]ervicing [r]ights related to any [m]ortgage [l]oan, the Seller shall use its best efforts to promptly cure such breach in all material respects, and if such breach cannot be cured, the Seller shall, at the Servicer's option, repurchase the [s]ervicing [r]ights affected by such breach at [a price set by a contractual formula].

2012 WL 3201139, at *6. Technically, this was not a contractual provision addressing the accrual of claims, but rather a provision governing the Seller's obligation to cure, and the *Central Mortgage* decision did not consider whether it operated as a condition precedent to suit. For purposes of the timelines analysis in that case, the *Central Mortgage* decision considered only whether common law tolling applied to the plaintiff's claims.

The Dismissal Ruling gave insufficient weight to the *Aircraft Services* line of authority, while reading *Central Mortgage* too broadly as suggesting implicitly that the Accrual Provision could not extend the statue of limitations. Assuming that the Borrowing Statute called for applying Delaware's shorter statute of limitations period, then Delaware's rules about the operation of that shorter period, including when claims

23

accrue, also applied.[15] Under those rules, the Accrual Provision operated as a condition precedent to when a claim arose and the statute of limitations began to run. That condition could not have been met until the Trust demanded in December 2011 that EMC comply with the Repurchase Provision and then EMC failed to repurchase loans within 90 days of notice. The Trust filed suit on July 16, 2012, some four months after EMC breached its obligations, well within a three-year limitations period. Therefore, assuming that the Borrowing Statute called for the application Delaware's three-year statute of limitations, the Trustee's claims were timely, and reconsideration is warranted.

## C.    Section 8106(c)

Finally, again assuming that the Borrowing Statute called for the application of Delaware's three-year statute of limitations, reconsideration is warranted because of Section 8106(c). That statutory amendment became effective on August 1, 2014, before the court's ruling on the motion to dismiss. It states:

> Notwithstanding anything to the contrary in this chapter (other than Section 8106(b)) or in § 2-725 of Title 6, an action based on a written contract, agreement or undertaking involving at least $100,000 may be brought within a period specified in such written contract, agreement or undertaking provided it is brought prior to the expiration of 20 years from the accruing of the cause of such action.

---

[15] *See Frombach v. Gilbert Assocs., Inc.*, 236 A.2d 363, 366 (Del. 1967) (holding that "the borrowed statute [of limitations] is accepted with all its accoutrements"); *de Adler v. Upper N.Y. Inv. Co.*, 2013 WL 5874645, at *13 n.149 (Del. Ch. Oct. 31, 2013) (for purposes of the Borrowing Statute analysis, "'accoutrements,' such as claim accrual and tolling doctrines" are considered together with the limitations period); *Delargy v. Hartford Accident and Indemnity Co.*, 1986 WL 11562, at *2 (Del. Super. Oct. 8, 1986) (same).

24

10 *Del. C.* § 8106(c). The court was aware that the General Assembly had enacted Section 8106(c), but had not focused on the effective date. If the Dismissal Ruling had taken into account the effectiveness of Section 8106(c), then the result would have been different.

Section 8106(c) was intended to allow parties to contract around Delaware's otherwise applicable statute of limitations for certain actions based on a written contract, agreement or undertaking. Synopsis to House Bill No. 363. By stating that the written contract, agreement, or undertaking could refer to a "period specified," Section 8106(c) created a flexible framework for defining the time in which suit can be brought. Although the "period specified" could refer to a particular date or a period measured in traditional units of time (*e.g.,* months, days, years), the amendment equally contemplated other measures, such as "a period of time defined by reference to the occurrence of some other event or action, another document or agreement or another statutory period" or even "an indefinite period of time." *Id*. If the contract specified an indefinite period, then the action nevertheless must be brought "prior to the expiration of 20 years from the accruing of the cause of such action." 10 *Del. C.* § 8106(c).

### 1. Retroactivity

Because the General Assembly enacted Section 8106(c) after the securitization closed, the defendants contend that it should not apply retroactively to the Trust's claims. Delaware precedent explains that a modification of a limitations period is a procedural matter affecting remedies rather than a change in substantive law. Ordinary presumptions against retroactivity do not apply, and the modification applies to ongoing suits absent a

25

showing of manifest injustice. The current case does not present any concerns of injustice that would limit the application of Section 8106(c).

As a preliminary matter, the General Assembly has the power to modify statutes of limitations at any point in time, including the authority to revive stale claims. *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1259 (Del. 2011).

> Statutes of limitation find their justification in necessity and convenience rather than in logic. . . . They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay. . . . Their shelter has never been regarded as . . . a "fundamental right". . . . [T]he history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

*Id.* (quoting *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945)) (alterations in original).

If the General Assembly chooses to alter the statute of limitations, then the change applies not only to future claims, but also presumptively governs existing claims. *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 529 (Del. Ch. 2005); *see Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 354 (Del. 1993). "[A] statutory amendment is remedial, and may apply retroactively, when it relates to practice, procedure or remedies and does not affect substantive or vested rights." *Hubbard*, 633 A.2d at 354. Statutes of limitations are procedural limitations on remedies; statutory changes to the limitations period are therefore given retrospective construction.[16]

---

[16] *See id.*; *Sokolove v. Marenberg*, 2013 WL 6920791, at *5 (Del. Super. Dec. 5, 2013); *Waterhouse v. Hollingsworth*, 2013 WL 5803136, at *3 (Del. Super. Oct. 10, 2013); *Brady*, 870

A court nevertheless may limit the retroactive application of a change in the statute of limitations where retroactive application would cause injustice. *See FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 487 (9th Cir. 1991) (explaining that a change to statute of limitations would operate retroactively absent legislative intent to the contrary or "manifest injustice"); *Brady*, 870 A.2d at 530-31 (considering whether retroactive revival of claims would be unjust). In this case, applying Section 8106(c) to the Trust's claims would not be unjust to the defendants. First, the Trustee filed its claims before the statute of limitations had expired in New York, so the claims were timely under the law of the jurisdiction governing the claims. Second, the defendants did not assert a timeliness defense until two years after the dispute arose, including after the parties had engaged in a lengthy meet-and-confer process that contemplated resolving loan disputes on their merits. During the meet-and-confer process, the defendants never argued that the Trustee's claims were untimely. Third, the case was still pending when the General Assembly enacted Section 8106(c) and when the statute became effective, so the amendment addressed live claims. It did not have the effect of reviving extinguished claims. Finally, the relevant agreements contained an Accrual Provision that contemplated permitting claims to be asserted well after the securitization closed, and the defendants committed through the Binding Representation Provision that the Accrual

---

A.2d at 529. The defendants' authorities about statutes not operating retroactively are inapposite because they address substantive changes in law, not procedural or remedial matters.

Provision was effective. Under the circumstances, it is not manifestly unjust to apply Section 8106(c) to the Trust's claims.

## 2. The Application Of Section 8106(c) To The Purchase Agreement

The Purchase Agreement contains provisions designed to modify the statute of limitations for purposes of claims for breaches of representations and warranties. Under Section 8106(c), those provisions are valid and effective.

Parties typically make representations in a transaction agreement so that the representations "can provide a basis to avoid closing to the extent that their truth is made a condition to closing." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *13 (Del. Ch. July 11, 2011). Absent contract language providing to the contrary, pre-closing representations about the acquired property interest become ineffective post-closing under the same rationale that causes representations about real property to merge with a warranty deed. *Id.* at *13 & n.70 (citing Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 15.02[2] and ABA Revised Model Stock Purchase Agreement With Commentary, Working Draft (Dec. 14, 2009) § 11.1 cmt. at 198). Parties can contract for representations to survive closing by incorporating a survival clause in the transaction agreement. *Id* at *14.

Once a transaction agreement provides for representations to survive closing, the next question is how long they can survive. Before the effectiveness of Section 8106(c), the maximum survival period was three years, because of certain Delaware decisions which held that parties could shorten but not lengthen a statute of limitations by

28

contract.[17] But with the effectiveness of Section 8106(c), parties can now extend the statute of limitations up to a maximum of twenty years.

Section 17 of the Purchase Agreement, entitled "Representations, Warranties and Agreements to Survive Delivery," provided for survival of the Loan Representations. It stated:

> All representations, warranties and agreements contained in this Agreement, or contained in certificates of officers of [EMC] submitted pursuant hereto, shall remain operative and in full force and effect and shall survive delivery of the Mortgage Loans to [to the Trustee].[18] Subsequent to the delivery of the Mortgage Loans . . . each of [EMC's] representations and warranties contained herein with respect to the Mortgage Loans shall be deemed to relate to the Mortgage Loans actually delivered . . . and

---

[17] *Menefee, ex rel. Menefee* v. *State Farm Mut. Ins. Co.*, 1986 WL 630314, at *1 (Del. Super. July 11, 1986) ("[A] contract provision for a longer period of limitation than provided by the applicable statute would be void as against public policy."); *Shaw v. Aetna Life Ins. Co*., 395 A.2d 384, 386-87 (Del. Super. 1978) ("Two parties contracting between themselves cannot agree to circumvent the [statute of limitations] as mandated by the legislature in its attempt to protect the public interests."); *see Aircraft Serv*., 2014 WL 4101660, at *4 ("Delaware courts have held that parties to a contract may not circumvent the law by extending statutes of limitations[.]"); *Bonanza Rest. Co. v. Wink*, 2012 WL 1415512, at *1 (Del. Super. Apr. 17, 2012) ("A contractual provision that extends a statutory limitations violates public policy and is not enforceable."), *aff'd*, 65 A.3d 616 (Del. 2013). Notwithstanding these decisions, Delaware Supreme Court precedent enabled sophisticated parties who knew the trick to extend the statute of limitations through the simple expedient of adding "the word 'seal' next to an individual's signature." *Whittington,* 991 A.2d at 14. That single word operated to extend the statute of limitations for a breach of contract action from three years to twenty years. *Id.* Parties then could shorten the twenty-year statute of limitations for the sealed agreement, enabling a contract to specify a statutes of limitations period longer than three years and up to twenty years. *See* Melissa DiVincenzo, *Repose vs. Freedom – Delaware's Prohibition on Extending the Statute of Limitations by Contract: What Practitioners Should Know*, 12 Del. L. Rev. 29, 51 (2010) (describing mechanism and its utility). But parties who did not know the "sealed" trick were limited to a three-year maximum, even if they tried to make their representations last longer by stating that they would.

[18] The actual text of the provision referred to "delivery of the Mortgage Loans to the [Conduit] (and by the [Conduit] to the Trustee)." The emendation in the text omits the reference to the Conduit.

included in the Final Mortgage Loan Schedule and any Replacement Mortgage Loan . . . .

MLPA § 17. The Accrual Provision then operated to extend the statute of limitations up to the statutory maximum of twenty years. It stated that

> [a]ny cause of action against [EMC] or relating to or arising out of a breach by [EMC] of any representations and warranties made in this Section 7 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by [EMC] or notice thereof by the party discovering such breach and (ii) failure by [EMC] to cure such breach, purchase such Mortgage Loan or substitute a qualifying Replacement Mortgage Loan pursuant to the terms hereof.

MLPA § 7. Under the language of the agreement, a cause of action would accrue only when both conditions were met, *i.e.*, after both discovery of the breach by EMC *and* EMC's failure to take remedial action.

Taken together, this scheme constituted "a period of time defined by reference to the occurrence of some other event or action" that is a sufficient "period specified" for purpose of Section 8106(c). The provisions established a "period specified" in which EMC's representations remained operative following closing, and the three-year statute of limitations for the Trustee's cause of action for breach was extended so that it would not begin to run until after the events specified in Section 7 of the Purchase Agreement, *i.e.*, after both discovery of the breach by EMC *and* EMC's failure to take remedial action, occurred. Because this structure does not specify an outside date for bringing claims, it is subject to the statutory maximum in Section 8106(c), such that any claim by the Trustee must be brought prior to the expiration of twenty years after the closing of the securitization, or June 28, 2026.

The Trustee brought its claims within three years after both discovery of the breach by EMC *and* EMC's failure to take the contractually required remedial action. EMC refused to provide a make-whole payment for all but a small fraction of the loans that the plaintiff identified as defective during a process that began in December 2011. The Trustee filed its original complaint in this court on July 16, 2012. Once Section 8106(c) eliminated any challenge to the validity of the Accrual Provision, then the defendants' statute of limitations argument became ineffective.

**D.    The Remaining Grounds For Dismissal**

The Trustee has shown that the Dismissal Ruling overlooked or gave insufficient attention to principles of law that would have resulted in a different outcome. Reargument is therefore granted. This in turn requires consideration of the defendants' other arguments for dismissal of the Complaint.

According to the defendants, the substantive allegations in the Complaint fail to state a claim on which relief could be granted. *See* Ch. Ct. R. 12(b)(6). In a Delaware state court, the pleading standards for purposes of a Rule 12(b)(6) motion "are minimal." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). "When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof." *Id.* (footnote omitted). The operative test in a Delaware state court thus is one of

31

"reasonable conceivability." *Id*. at 537 (footnote and internal quotation marks omitted). This standard asks whether there is a "possibility" of recovery. *Id*. at 537 n.13. The test is more lenient than the federal "plausibility" pleading standard, which invites judges to "'determin[e] whether a complaint states a plausible claim for relief' and 'draw on ... judicial experience and common sense.'" *Id*. at 537 (alteration in original).

### 1. The Repurchase Claim

Counts I, II, and III assert claims for breach of the Repurchase Provision, framed alternatively in the language of damages, specific performance, and declaratory judgment. The defendants argue that the Complaint does not state a claim for breach of EMC's obligations to repurchase any Mortgage Loans, but this position is specious. Both the Servicing Agreement and the Purchase Agreement require EMC to repurchase defective loans. The Complaint alleges a pervasive pattern of breaches infecting the vast majority of the Mortgage Loans that the Trustee has examined, as well as specific and detailed descriptions of breaches with respect to certain individual loans. For pleadings purposes, these allegations are sufficient with respect to all Mortgage Loans in the Trust.[19] Counts I, II and III survive this motion to dismiss.

---

[19] *See Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 2013 WL 4488367, at \*3 (N.Y. Sup. Ct. Aug. 16, 2013) ("As other courts that have dealt with RMBS cases have held, the Complaint sufficiently states a cause of action for breach of contract by alleging that a loan level review revealed over 90% of the loans violate some warranty and that Plaintiffs demanded that [the responsible party] repurchase all non-conforming loans."); *MBIA Ins. Corp. v. Credit Suisse Secs. (USA) LLC*, 927 N.Y.S.2d 517, 534 (N.Y. Sup. Ct. 2011) ("Although [the plaintiff] may ultimately be required to itemize the breaches constituting its contract claims, the pleadings give sufficient notice of the claim at this juncture.") *reh'g granted and rev'd on other grounds*, 102 A.D.3d 488 (N.Y. App. Div. 2013); *Ambac Assurance Corp. v. DLJ Mortg. Capital, Inc.*, 2011 WL 1348375, at \*1 (N.Y. Sup. April 7, 2011)

As remedies for its claims, the Complaint seeks various types of relief other than enforcement of the Repurchase Provision or compensatory damages for breach of the Repurchase Provision. The Exclusive Remedy Provision generally limits the types of relief that the Trustee can seek to either (i) an order directing "performance of [the] repurchase obligation" or (ii) "award of damages equal to the repurchase amount, consistent with the sole remedy provision."[20] It is possible, however, that the Trustee could prove at trial that the defendants' widespread breaches of representations and warranties were so substantial and fundamental as to defeat the object of the parties in making the contract. *Sheehan v. Hepburn,* 138 A.2d 810, 812 (Del. Ch. 1958) ("[A]n unjustified failure to perform basic terms of a contract warrants rescission rather than mere damages."). At the pleadings stage, the court will not rule out the possibility of other remedies, such as rescissory damages. *See Ambac Ins. Corp. v. EMC Mortg. Corp*., 2009 WL 734073, at \*2 (S.D.N.Y. Mar. 16, 2009) (denying defendant's request to strike rescissory damages on the basis that it was premature); *Assured Guar. Mun. Corp. v. UBS*

---

(denying motion to dismiss for lack of notice because the plaintiff "has conducted a review that has revealed breaches in many of the Loans reviewed"), *reh'g granted and rev'd on other grounds*, 102 A.D. 3d 487 (N.Y. App. Div. 2013).

[20] *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, 2013 WL 6997183, at \*3 (N.Y. Sup. Ct. Jan. 15, 2014) *aff'd*, 121 A.D.3d 535 (N.Y. App. Div. 2014); *see also Ace Secs. Corp. v. DB Structured Prods., Inc.*, 2014 WL 1384490, at \*1 (N.Y. Sup. Ct. April 04, 2014) (The defendant "can be compelled to either specifically perform its obligation to repurchase loans or to pay damages equivalent to the cost of repurchase."); *Morgan Stanley Mortg.*, 2013 WL 4488367, at \*3 (holding that damages for liquidated loans under a repurchase provision are still available up to the total "repurchase price").

*Real Estate Secs., Inc.*, 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012) ("It would be premature to strike a remedy at the pleadings stage.").

### 2. The Notice Claim

Count IV asserts a claim for breach of the notice provisions in the Purchase Agreement and Servicing Agreement. The notice claim is redundant and will be dismissed. "[N]o matter the basis for plaintiff's put-back cause of action, it is a claim for an amount of money under the Repurchase Protocol for non-compliant loans. Consequently, much of the parties' dispute . . . [including] how to properly characterize the breach (e.g. failure to repurchase vs. failure to notify) . . . does not merit further discussion." *Bank of New York Mellon v. WMC Mortg., LLC*, 2013 WL 6153207, at *1 (N.Y. Sup. Ct. 2013) (footnotes omitted).

### 3. Reimbursement

Count V asserts a claim for breach of the Reimbursement Provision. This provision stated that EMC "shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach." PSA § 2.03(c). Such a breach refers to "a breach of a representation or warranty set forth in the Mortgage Loan Purchase Agreement," which is the subject of § 2.03(c). *Id*. The defendants argue that this provision must apply only to third-party claims, but the defendants and the Trustee are the only parties to which this provision applies. The defendants also argue that the Trustee is limited to repurchase as its sole remedy under this section of the Servicing Agreement, but such an interpretation would read the reimbursement provision out of the contract. *See E.I. du*

34

*Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."). The plain language of the Reimbursement Provision covers the Trustee's expenses. The plaintiff has stated a claim for reimbursement.

### 4.    Indemnification

Count VIII asserts a claim for indemnification. The Servicing Agreement contains the following indemnification provision:

> The Master Servicer agrees to indemnify the [Trustee] and to hold [the Trustee] harmless against, any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or relating to, any claim or legal action (including any pending or threatened claim or legal action) relating to this Agreement, including any powers of attorney delivered pursuant to this Agreement, the Custodial Agreement or the Certificates (i) related to the Master Servicer's failure to perform its duties in compliance with this Agreement (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) or (ii) incurred by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder. . . . This indemnity shall survive the resignation or removal of the Trustee or Master Servicer and the termination of this Agreement.

PSA § 2.03(c).

Unlike the reimbursement provision, the indemnification provision contemplates indemnification for third-party actions. For example, the Trustee is required to provide the Master Servicer prompt written notice of a legal action, which would be unnecessary if the action in question was a claim against the Master Servicer. New York courts interpreting indemnity provisions that contemplate third-party actions presume that the

provisions do not apply to intra-party disputes absent "unmistakably clear" language to the contrary. *See DLJ Mortg. Capital, Inc.*, 2013 WL 6997183, at *4. The indemnification provision, unlike the reimbursement provision, therefore only applies to third-party claims. *See Bear Stearns Mortg. Funding Trust 2007 AR2 v. EMC Mortg. LLC*, 2013 WL 164098, at *3 (Del. Ch. Jan. 17, 2013).

### 5. Failure to Provide The Mortgage Files And Other Documents

Counts VI and VII of the Complaint assert that the defendants have failed to provide the Trustee with documents to which the Trustee is entitled under the Purchase Agreement and Servicing Agreement. The defendants responded to these counts by claiming that they had already provided sufficient documentation and that U.S. Bank completes an accounting of its own each month. "In ruling on a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court is generally limited to facts appearing on the face of the pleadings." *Reid v. Spazio*, 970 A.2d 176, 183-84 (Del. 2009). The fact-based question of whether the documents delivered by the defendants complied with their obligations is not appropriate for resolution on a motion to dismiss.

### 6. The Unjust Enrichment Claim

Count X pleads a claim for unjust enrichment as an alternative theory of recovery if the contracts do not apply. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (internal quotation marks omitted). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation

36

between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). If an "express, enforceable contract [] controls the parties' relationship . . . a claim for unjust enrichment will be dismissed." *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006).

Here, the defendants have argued that the plaintiff lacks any remedy under the Purchase Agreement and Servicing Agreement. If the contracts do not apply, then the Trustee's unjust enrichment claim may have force. According to the Complaint, EMC asserted claims of its own against the loan originators for providing the non-conforming loans that EMC assembled and conveyed to the Trust. Although EMC obtained monetary settlements from the loan originators, EMC did not pass along the proceeds to the Trust, which held the non-conforming loans and suffered the actual loss. If those allegations were proven, a claim of unjust enrichment could exist, because EMC would have been enriched by retaining compensation for the non-conforming loans that it should have passed along to the Trust. At this stage in the litigation, it is premature to dismiss the unjust enrichment claim. The motion to dismiss Count X is denied.

### III.    CONCLUSION

The Trustee's motion for reargument is granted. The defendants' motion to dismiss is granted as to Count IV and VIII. It is otherwise denied. The parties shall submit an implementing order.

37